106 F.3d 401
 116 Ed. Law Rep. 39
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Allen MORGAN, Superintendent, Knox County Schools, Plaintiff-Appellant,
v.
CHRIS L., a minor, by next friend, MIKE L., Defendant-Appellee.
 No. 94-6561.
 United States Court of Appeals, Sixth Circuit.
 Jan. 21, 1997.
 
 Before: CONTIE, SUHRHEINRICH, and COLE; Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Allen Morgan, Superintendent of the Knox County (Tennessee) School System, appeals the judgment of the district court affirming the ALJ's decision that the Knox County School System violated the Individuals with Disabilities in Education Act (the "IDEA") by (1) filing a juvenile court petition against Chris L., who was diagnosed with attention deficit hyperactive disorder and (2) by not following the appropriate procedures for initiating a "change in placement," 20 U.S.C. §§ 1400 et seq. For the following reasons, we affirm the judgment of the district court.
 
 I.
 
 2
 Chris L. ("Chris") attended Knox County Northwest Middle School during the 1991-1993 school years. In May 1992, at the suggestion of a school psychologist, Chris was sent to a private medical doctor about his behavorial problems. Chris's physician diagnosed him as suffering from attention deficit hyperactive disorder ("ADHD") and was prescribed the medication Ritalin to control his behavior, part of which was to be administered during school hours. Mike L., Chris's father, made the school aware of Chris's diagnosis and the medication that he was to receive. There is no dispute that the school knew that Chris suffered from ADHD and that the school knew he was being treated for the disorder.
 
 
 3
 Chris's academic and behavioral problems worsened. On February 11, 1993 the school initiated the process to consider Chris's eligibility for disabled status under the IDEA.[1] The school sent home an IDEA consent form notifying Chris's parents of that process. On February 12, 1993, Chris's pediatrician increased his medication. On February 26, 1993, the school referred the matter to the IDEA school support team ("S-team") to gather information about Chris's disability. On March 16, 1993, Chris's father returned the consent form. During this period, Chris began psychotherapy at the suggestion of school personnel, yet his behavior continued to worsen. After sending the consent form, the school took no further action in determining whether Chris was considered handicapped under the IDEA.
 
 
 4
 On May 11, 1993, Chris and another boy entered a bathroom on school property to which they were not allowed access. During that time, the students allegedly vandalized a water pipe, resulting in approximately $1000 water damage. Chris was suspended for three days as a result of this incident. On May 12, 1993, the Knox County School System filed a petition in the Juvenile Court of Knox County, Tennessee, against Chris. On May 17, 1993, the school system scheduled a disciplinary hearing. While this disciplinary hearing was in progress, it was modified to become an "M-team" meeting because Chris had been taking medicine for ADHD.[2] Chris's parents were notified of the disciplinary hearing and attended the meeting; however, they were given no notice of the possibility of an M-team meeting. The school psychologist, the school principal, the school guidance counselor, and another teacher who was well acquainted with Chris's academic and behavioral troubles, were also at the meeting. The school system's security officer, who filed the juvenile court petition, was not in attendance. During this meeting, Chris was certified as disabled for purposes of the IDEA because of ADHD. As a disabled student, the M-team created an Individualized Education Plan ("IEP") for Chris. They decided that in the future Chris's education would take place in a self-contained special education classroom with work that was provided by the regular eighth grade teachers with an emphasis on behavior. Chris's parents reviewed the M-team's assessment and agreed to its recommendations.
 
 
 5
 At this meeting, the vandalism incident was also discussed. After Chris's certification, the principal surmised that Chris's destructive behavior in the bathroom might have been attributed to his ADHD; however, his unauthorized presence in the bathroom could not be explained by his handicap. The principal decided that the presence in an unauthorized place would result in discipline. The school principal also told the parents that the decision of whether to file a juvenile court petition would be made later. Chris's parents were later notified by mail that a juvenile court petition had already been filed on May 12, 1993, prior to their disciplinary/M-team meeting on May 17, 1993.
 
 
 6
 On June 4, 1993, Chris's parents requested a hearing with an Administrative Law Judge ("ALJ") before the state board of education, asserting that the school system had violated the IDEA in filing the petition. The school system filed a motion to dismiss the matter, alleging that the ALJ did not have jurisdiction in that only the juvenile court and the state court of appeals could consider whether the filing of a juvenile petition violated the IDEA. On July 30, 1993, the ALJ issued his order, denying the motion to dismiss and requiring the Knox County School System to seek the dismissal of the juvenile court petition because the destruction of school property had been a manifestation of Chris's disability. The ALJ also determined that the filing of a juvenile petition could be considered a "change in placement" under the IDEA.
 
 
 7
 Despite having been ordered to seek the dismissal of the juvenile petition, the Knox County School System did not do so. On appeal from the ALJ's decision, the district court determined that the ALJ's order was entitled to deference and that the school administration had failed to comply with the procedural requirements of the IDEA in (1) determining that Chris was eligible to be treated as a disabled child, (2) notifying Chris's parents that he should be certified as educationally disabled because of ADHD, and (3) filing a petition in juvenile court.
 
 
 8
 One issue remains before this court today: whether on May 12, 1993, by filing a juvenile court petition for the alleged destruction of school property, the Knox County School System was in violation of IDEA procedural requirements insuring Chris's rights.
 
 II.
 
 9
 a. Standard of Review
 
 
 10
 The Supreme Court has previously articulated the proper standard of review for cases that fall under the IDEA in Hendrick Hudson District Board of Education v. Rowley, 458 U.S. 176 (1982). "[Rowley ] requires a de novo review [of the Due Process hearing] but ... the district court should give due weight to the state administrative proceedings in reaching its decision." Roncker ex rel Roncker v. Walter, 700 F.2d 1058, 1062 (6th Cir.1983), cert. denied, 464 U.S. 864 (1983). Our court has explained that the "federal courts are 'generalists with no expertise in the educational needs of handicapped children,' and will benefit from the fact finding of a state agency with expertise in the field." Doe v. Smith, 879 F.2d 1340, 1343 (6th Cir.1989), cert. denied, 493 U.S. 1025 (1990).
 
 
 11
 The degree of deference owed to the lower courts in a case like this, however, is uncertain. Often appellate courts have been unable to discern guidelines that are clear from the statutory language. See, e.g., Thomas v. Cincinnati Board of Education, 918 F.2d 618 (6th Cir.1990). The issue of what procedural protections are afforded a disabled child under the IDEA is an issue of law and will receive de novo review. See Roncker, 700 F.2d at 1062.
 
 
 12
 b. The IDEA
 
 
 13
 The IDEA was enacted to ensure the right to a free and appropriate public education to all children with disabilities. See S.Conf.Rep. 94-455, 94 Cong., 1st Sess. 27, reprinted in [1975] U.S.Code Cong. & Ad.News 1480 and 20 U.S.C. § 1412. The Act defines a "free and appropriate education" as "special education and related services." 20 U.S.C. § 1418(18). "Special education" is defined as "specially designed instruction" that may occur in a number of settings including "classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16). If a student is categorized as disabled under the IDEA, a specially designed and written education plan is required. The IEP must be written and address the unique educational needs of the specific child. 20 U.S.C. § 1401(19).
 
 
 14
 In order to be eligible for federal assistance under the IDEA, a state must have a policy in place that will identify, locate and evaluate children who have a disability or who are suspected of having a disability. 20 U.S.C. §§ 1412(1) and 1412(2)(C); 34 C.F.R. § 300.128. Once a child has been identified as disabled under the IDEA, a state must ensure that a free and appropriate education is available to meet the disabled child's needs. 20 U.S.C. § 1412(2)(B) and 34 C.F.R. § 300.121. After the process is initiated in determining a child's status as disabled, the child's educational placement and any subsequent changes in placement are governed by the procedures of the IDEA.
 
 
 15
 An M-team, including the child's parents, must make or review all decisions which seek to initiate or change the placement of a child with a disability or in the process of being identified as disabled. Once an M-team has met, and the school administration recommends that a "change in placement" take place for the disabled student, the parents have the right to object to the proposal and initiate a due process hearing. 20 U.S.C. § 1415(b)(1)(E). Once a parent has initiated a due process hearing, the disabled child is to "remain in the then current educational placement" pending the conclusion of the proceedings. 20 U.S.C. § 1415(e)(3). Thus, school administrators cannot unilaterally make a change in placement for a disabled student without convening an M-team meeting nor can they do so without including the disabled child's parents.
 
 
 16
 Under the IDEA, a "change in placement" is defined as a fundamental change in, or elimination of, a basic element of a child's educational program. Lunceford v. District of Columbia Board of Education, 745 F.2d 1577, 1582 (D.C.Cir.1984). See also, Abney v. District of Columbia, 849 F.2d 1491, 1492 (D.C.Cir.1988) (although new site was not precisely identical, a change in placement did not occur). This court decided that a "change in placement" does not occur when a student is transferred from one school to another with a comparable program. Tilton v. Jefferson County Board of Education, 705 F.2d 800 (6th Cir.1983), cert. denied, 465 U.S. 1006 (1984). However, a "change in placement" does occur when a student is transferred from a year-round program to an alternative 6-month program, but because the transfer was necessitated by budget constraints, Tilton held that this change in placement did not trigger the procedures that suggest no changes be made as under 20 U.S.C. § 1415(e)(3).
 
 
 17
 When disciplining a disabled child, the courts have unanimously held that expulsion or suspension for more than ten days is a "change in placement." Kaelin v. Grubbs, 682 F.2d 595 (6th Cir.1982). See also, S-1 v. Turlington, 635 F.2d 342 (5th Cir.1981), cert. denied, 454 U.S. 1030 (1981). In Honig v. Doe, 484 U.S. 305 (1988), the Supreme Court addressed how schools were to accommodate disabled students who were dangerous and disruptive. The Supreme Court found that if a school system wished to suspend for more than ten days or expel a disabled student, that such an action was a "change in placement" that must be implemented through the M-team and the IEP process, where the parents have the right to initiate a due process hearing if they disagree with the proposed "change in placement." If the parents ask for a due process hearing, the child is to remain in the current placement, until the proceedings are resolved.
 
 III.
 
 18
 Children served by the IDEA suffer from a variety of physical, neurological and emotional disabilities. Chris suffered from ADHD which is recognized as a disability under the IDEA in the category of "other health impairments." 34 C.F.R. § 300.5(7). Chris's school performance was adversely affected by his ADHD in two distinct ways: (1) he suffered from failing grades and (2) he had difficulty controlling his behavior. Pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, a school must accommodate a disabled student's behavioral difficulties by developing a behavior management/discipline plan. Despite a long history of behavioral difficulties and failing grades, Knox County Schools failed to formulate a plan of intervention to accommodate Chris's known problems.
 
 
 19
 States must also comply with the procedural safeguards of the IDEA. 34 C.F.R. § 300.531 sets forth the pre-placement evaluation requirements and provides that, before a child is placed in a special educational program, "a full and individual evaluation of the child's educational needs must be conducted in accordance with the requirements of § 330.532." The evaluation procedure specified in § 330.532 requires testing, evaluation by a multi-disciplinary team and assessment of all areas related to the disability. The regulations also provide that, when interpreting the data resulting from the evaluation procedures, consideration must be given to a variety of sources including test results, teacher evaluations, physical condition and adaptive behavior. 34 C.F.R. § 300.533. This Court requires strict compliance with the evaluation procedures of the Act. Babb v. Knox County School System, 965 F.2d 104 (6th Cir.) (school district's failure to fully examine academic, emotional and psychological profiles constituted procedural violation), cert. denied, 113 S.Ct. 380 (1992).
 
 
 20
 The IDEA requires an M-team meeting whenever a child with disabilities exhibits significant problematic behavior, regardless of whether school officials are contemplating a conventional change in placement, suspension, expulsion or juvenile charges. Mandated IDEA procedures include the convening of an M-team meeting with full consideration of the child's needs evaluation date, current program and placement, and placement options consistent with 34 C.F.R. §§ 300.343, 300.344, and 300.533. The IDEA also requires a meaningful opportunity for, and efforts by school officials to insure, parental participation in the meeting pursuant to 34 C.F.R. §§ 300.344 and 300.345. An M-team meeting must meet all of the IDEA procedural requirements in order to insure that the disabled child is being provided with a free and appropriate public education. Congress included procedural safeguards in the IDEA as a means of curbing the unilateral ability of schools to punish a disabled student for behavior that is a manifestation of the student's disabilities. Accordingly, the decisions of the ALJ and the district court simply require that schools contemplating juvenile petitions do what the IDEA requires of them.
 
 
 21
 When school systems fail to accommodate a disabled students' behavioral problems, these problems may be attributed to the school system's failure to comply with the requirements of the IDEA. See generally Kaelin v. Grubbs, 682 F.2d 595 (6th Cir.1982) (recognizing the connection between an inappropriate IEP and a student's disciplinary difficulties). In the instant action, the juvenile court petition filed by the Knox County Schools against Chris was the culmination of a long series of disciplinary actions taken against him by the school system despite their awareness of a disability and his deteriorating grades and behavior. No intervention, such as a behavior management plan, was formulated during the 1992-1993 school year. Notwithstanding the IDEA's rigid set of procedural safeguards set forth in 20 U.S.C. § 1415, Chris was not afforded IDEA protections before being subjected to juvenile court prosecution by the Knox County Schools. Indeed, rather than affording Chris the procedural safeguards mandated by the IDEA, the Knox County Schools sought to exclude him through a punitive and disciplinary measure in juvenile court.
 
 
 22
 Both the ALJ and the district court determined that the juvenile court action filed by the Knox County School System was a proposal for, or the initiation of, a change of educational placement that, prior to filing, should have triggered the procedural safeguards of the IDEA including the convening of an M-team meeting, under 20 U.S.C. § 1415(b)(1)(C)(i) and (ii). By filing a juvenile court petition, the Knox County School System threatened Chris with a fundamental alteration "in his educational program." Indeed, the school system's filing of the petition is at odds with its obligation to provide Chris with a free and appropriate education under the IDEA. The record reveals that Chris began the 1992-1993 school year without the special education and supportive and corrective services to which the IDEA entitled him. School officials continued to treat Chris as a disciplinary problem even though they knew that he suffered from ADHD and was being medically treated for his problem. Accordingly, the juvenile delinquency petition filed on May 12, 1993 must be viewed as a breach of the school system's obligation under the IDEA to identify, evaluate, and appropriately educate Chris as a child with disabilities.
 
 
 23
 The juvenile court petition sought Chris's adjudication, punishment and disposition as a delinquent for having entered, without authorization, and then damaged a water pipe in one of the school's bathrooms. The juvenile court petition could lead to Chris's incarceration in a juvenile detention facility. See Tenn.Code § 37-1-114(a)(1) (a child may be taken into custody when there is probable cause to believe that he or she has committed the delinquent or unruly act with which he or she is charged). Even if Chris is not incarcerated as a result of the petition, the school system conceded that one purpose of filing the petition was to secure rehabilitative services for Chris. See Tenn.Code § 37-1-120(1) (a juvenile court petition for delinquent or unruly conduct must allege "that the child is in need of treatment or rehabilitation"). By resorting to juvenile court, the school system is, at a minimum, proposing that the juvenile court develop its own program of rehabilitative services for Chris. Pursuant to IDEA's procedural safeguards, the school system must adopt its own plan and institute an M-team meeting before initiating a juvenile court petition for this purpose. See In re McCann, 1990 W.L. 16883 (Tenn.Ct.App.1990), perm. app. denied.[3]
 
 
 24
 Here, the school administration failed to comply with the IDEA's procedural requirements as to (1) a timely determination of Chris's eligibility to be treated as a disabled child, (2) the content and timing of the notification to Chris's parents of the M-team meeting on May 17, 1993 which certified Chris as educationally disabled because of ADHD, and (3) the filing of a juvenile petition as a change in educational placement entitling the child to the protections of the IDEA.
 
 
 25
 By ordering the Knox County School System to take all actions necessary to seek the dismissal of its juvenile court petition filed against Chris, the ALJ and the district court properly exercised their discretion by fashioning specific relief to redress the school system's failure to provide Chris with the education to which he is entitled under the IDEA.
 
 IV.
 
 26
 For the reasons enumerated above, we AFFIRM this district court's order.
 
 
 
 [1]
 Chris had been evaluated for an IDEA disability on one occasion, but school officials concluded that he was not eligible
 
 
 [2]
 An "M-Team" meeting is a "Multi-disciplinary Team" meeting that is specially organized by individuals with knowledge of the child and his behavior. 34 C.F.R. §§ 300.343, 300.344 and 300.345
 
 
 [3]
 In In re McCann, the Tennessee Court of Appeals reviewed a lower circuit court's decision affirming a juvenile court's adjudication of a disabled child as unruly. The appellate court noted that before the juvenile court had considered the petition filed by a school system employee administrators at the child's school had scheduled and then canceled an M-Team meeting, and had sent to the child's parents a letter notifying them that the child needed medical care and counseling. This letter also notified the parents that there was an appointment with a juvenile court judge to discuss the child's placement. The McCann court overruled the determination that the child was unruly, stating that the notice provided to the parents clearly failed to comply with Tennessee regulations which govern the notice required whenever a change in a disabled child's placement is considered. The court also held that the filing of the petition which resulted in the child not attending school for two months constituted a change in a disabled child's educational placement. In so doing, the court concluded that the school administration did have some choices when dealing with a dangerous disabled child. The school administration can suspend the child for up to ten days and then during that time apply for injunctive relief, but still must follow the procedural requirements of the IDEA
 As another example, in In re, Male Special Education Student Age 14, Tennessee Board of Education, Oct. 9, 1987, (Memorandum Decision at page 12, R. 268), the disabled boy required discipline for an act committed at school. The ALJ established that "[i]t was a violation of the special education law for the School System to initiate a juvenile petition against the child without first calling an M-Team meeting to determine how to deal with the boy's behavior." Thus, the ALJ ordered the school system to also seek the dismissal of the juvenile court petition which they had initiated. With the case of Chris, the ALJ also ordered that the school system seek the dismissal of the juvenile court petition and follow the requirements of the IDEA.