SHWARTZ, Circuit Judge,
dissenting.
At its core, this case is a licensing dispute between the New Jersey Department of Education (“NJDOE”) and the Learning Center for Exceptional Children (“LCEC”). Thwarted at the state administrative level, LCEC filed this lawsuit, joined by E.M. and her parents, in an effort to forestall NJDOE’s actions. Plaintiffs have attempted to stop NJDOE by relying on a provision of the Individuals with Disabilities in Education Act (“IDEA”), 20 U.S.C. § 1415, that is meant to prevent local agencies from changing a child’s education while the school and the parents address their disputes about the child’s educational placement. As more fully explained herein, § 1415 does not provide a basis for relief here because: (1) Plaintiffs do not satisfy the unambiguous statutory prerequisites; and (2) this provision does not cover challenges to a state’s licensing decision that equally applies to all students at a particular school. For these reasons, I dissent.
I
As the Majority has explained, E.M. is a disabled student receiving special education services at LCEC pursuant to an individualized education plan (“IEP”) devised by her parents and the Hoboken School District. Her IEP requires that a portion of her education be conducted with typically developing peers. This is known as “mainstreaming.” App. 21. Because LCEC only enrolls public school special education students, it arranged for students at its sister school, Today’s Learning Center, which enrolls private school general education students, to participate in activities with LCEC students.
The NJDOE has asserted that LCEC is not authorized to educate private school general education students alongside public school special education students. When LCEC failed to assure the NJDOE that such education was not occurring, NJDOE placed LCEC on conditional approval status, which meant it could not accept new students. LCEC, which consequently lost students (and revenue), construed this directive as barring mainstreaming, thereby limiting its ability to educate E.M. according to her IEP and contravening the IDEA’S goal of ensuring that students are educated in the least restrictive environment possible.
E.M. is caught in the cross-fire of this regulatory dispute: her IEP requires mainstreaming, but the school she attends cannot provide it. E.M. has invoked § 1415(j), IDEA’S “stay put” provision, to enjoin the NJDOE from interfering with the mainstreaming component of her IEP while the dispute between the NJDOE and LCEC remains unresolved. The able District Judge, confronted with the Plaintiffs’ frequently shifting positions on the relief sought and the basis for it, relied upon § 1415(j) and granted E.M. relief.
The narrow issue before us is whether the IDEA’S “stay put” provision is an appropriate mechanism to provide the relief E.M. seeks, namely the ability to obtain uninterrupted mainstreaming opportunities at LCEC. Because Plaintiffs have not satisfied the conditions for obtaining “stay put” relief under § 1415, E.M. is.not entitled to an injunction under this provision. In addition, because Plaintiffs are, in effect, challenging a state regulator’s policy *220 that applies to all children at the school, rather than a local educational agency’s decision specifically concerning E.M.’s IEP, the “stay put” provision does not apply and cannot provide a basis to enjoin the NJDOE’s regulatory actions,
II
As the Majority thoroughly explains, under the IDEA, parents and guardians play a central role in the education of their special needs children. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005); Honig v. Doe, 484 U.S. 305, 308, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). To this end, they participate in the creation of an IEP and must be provided with “[wjritten prior notice” whenever the “local educational agency ... proposes to initiate or change” or “refuses to initiate or change” the “educational placement of the child.” 20 U.S.C. § 1415(b)(3). If the parent is dissatisfied, then he or she may “present a complaint,” to which the local educational agency must respond. Id. § 1415(b)(6), (c)(2)(B). The parents are then entitled to an impartial hearing, an appeal to the. state educational agency, and judicial review of the state educational agency’s decision. Id. § 1415(f)(1)(A), (g).
Recognizing that these due process safeguards may result in lengthy proceedings, Congress enacted a “stay put” provision that “protects the status quo of a child’s educational placement,” C.H. ex rel. Hayes v. Cape Henlopen Sch. Dist., 606 F.3d 59, 72 (3d Cir.2010), by preventing “school districts from effecting unilateral change in a child’s educational program” during the proceedings. Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S., 96 F.3d 78, 83 (3d Cir.1996). The “stay put” provision provides:
[Djuring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in thé public program until all such proceedings have been completed.
20 U.S.C. §. 1415CÍ).[1] When read together with the IDEA’S due process safeguards, the “stay put” provision is only triggered (1) during the pendency of proceedings conducted under § 1415(2) when initiated by a parent who files a due process complaint (3) in response to a proposed change in the student’s educational placement. None of these prerequisites are met.
Plaintiffs filed this action in District Court without first initiating a proceeding under § 1415. Proceedings under § 1415 focus on the individual student’s education, “including] the conduct and development of evaluations, eligibility determinations, IEPs, and educational placement.” Michael C. ex rel Stephen C. v. Radnor Twp. Sch. Dist., 202 F.3d 642, 654 (3d Cir.2000). No such proceeding concerning E.M.’s education has been initiated. Although the Majority devotes pages to discussing whether this case is a “proceeding” under § 1415, the proper inquiry is whether there exists a separate pending § 1415 proceeding, such as a due process complaint or an appeal of a ruling on such a complaint. Because “stay put” operates *221 only “Muring the pendency” of such a proceeding, and no such proceeding has been initiated, § 1415’s “stay put” provision simply does not apply. See Moss by Mutakabbir v. Smith, 794 F.Supp. 11, 14 (D.D.C.1992) (holding that a federal action to enforce the “stay put” provision is not itself a pending proceeding under § 1415 that triggers “stay put”).
Moreover, as the Majority acknowledges, there is no evidence that a change in E.M.’s educational placement has been proposed or has occurred as the plain wording of § 1415 requires. The present record does not show that the Hoboken School District has taken steps to change E.M.’s IEP, that it intends to move E.M. to a different school with a different educational program, or that she presently lacks the mainstreaming opportunity thát has been described as being part of her IEP.[2] Indeed, even the Majority cannot dispute that the record is silent as to whether there has been any actual or proposed change in E.M.’s educational placement.[3] The majority also discusses exhaustion and concludes that it is not required here because the IDEA does not allow a parent to challenge a state agency’s licensing decision but rather provides a means to challenge changes to an individual’s educational placement. For reasons that I will explain, I agree. Indeed, that reasoning underscores why this is not a proceeding about E.M.’s educational placement covered by § 1415.
For these reasons, Plaintiffs have not satisfied the prerequisites to obtain a “stay put” order under § 1415 and, therefore, on this record, relief on that basis should not have been granted.
Ill
Plaintiffs’ reliance on the “stay put” provision fails for an additional reason. Even if Plaintiffs would otherwise satisfy the requirements for a change in educational placement under § 1415, they cannot overcome the general rule that the “stay put” provision does not apply when such a change results from a broad policy decision grounded in matters of licensing, administration, or fiscal policy, as opposed to a decision about an individual student. See, e.g. N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep’t of Educ., 600 F.3d 1104, 1117 (9th Cir.2010) (state implementation of furloughs that closed schools on Fridays was a state-wide administrative decision that did not constitute a change in placement triggering the “stay put” provision, although it could give rise to a failure to implement claim); Weil v. Bd. of Elementary & Secondary Educ., 931 F.2d 1069, 1073 (5th Cir.1991) (noting that “if the change in ‘educational placement’ is necessitated by the closure of a facility for reasons beyond the control of the public agency, the ‘stay-put’ provisions ... do not apply”); DeLeon v. Susquehanna Cmty. Sch. Dist., 747 F.2d 149, 153, 153 n. 8 (3d Cir.1984) (distinguishing cases that involved “broad policy decisions” that “could interfere with resource allocation” and applying “an expansive reading” to “change in educational placement” where “the decision involved is one that affects *222 the educational program of an individual child” (internal quotation marks and citations omitted)). While the Majority correctly points out that many cases that have refused to apply the “stay put” provision to counteract policy decisions have involved school closures due to budget allocation decisions, the same logic applies to similar state regulatory interests. Setting state educational policy, accrediting particular schools, and making difficult prioritization decisions through the budgetary process are all essential facets of the NJDOE’s regulatory role.
There are several reasons for denying individual plaintiffs the ability to invoke the “stay put” provision when they are challenging a system-wide policy or decision. First, “nothing in the legislative history or the language of the [IDEA] implies a legislative intent to permit interested parties to utilize the automatic injunction procedure of [the ‘stay put’ provision] to frustrate the” state’s policy decisions. Tilton by Richards v. Jefferson Cnty. Bd. of Educ., 705 F.2d 800, 804 (6th Cir.1983); N.D., 600 F.3d at 1116 (“Congress did not intend for the IDEA to apply to system wide administrative decisions,” and thus the “stay put” provision does not apply where a program or school is closed due to budgetary reasons). To the contrary, Congress had two goals in enacting the procedural protections of § 1415: (1) “to prevent the erroneous identification or classification of children as handicapped and the impairment of their subsequent education by ensuring that parents would be afforded prior notice and an opportunity to participate in such fundamental determinations,” Concerned Parents, 629 F.2d at 754;[4] and (2) to prevent the “ ‘total exclusion’ of disabled children” from school and their warehousing in specialized institutions, N.D., 600 F.3d at 1115 (quoting Honig, 484 U.S. at 325 n. 8, 108 S.Ct. 592). To address this latter concern, the “stay put” provision “strip[ped] schools of the unilateral authority [they] had traditionally employed to exclude disabled students from school and to protect children from any retaliatory action by the agency.” N.D., 600 F.3d at 1114 (internal quotation marks, alterations, and citations omitted); 20 U.S.C. § 1400(c)(2)(B). Because a policy decision that applies to all students “does not conflict with Congress’s intent of protecting disabled children from being singled out,” N.D., 600 F.3d at 1117, § 1415 is not a mechanism for challenging such decisions.
Second, permitting the “stay put” provision to be employed to challenge state policy decisions would effect a transfer of power from the state to parents. Tilton, 705 F.2d at 804 (state and local obligations under the IDEA do not result in an abdication of control to the parents over matters concerning the allocation of a school system’s educational resources); N.D., 600 F.3d at 1117 (“To allow the stay-put provisions to apply [to forestall furloughs] would be essentially to give the parents of disabled children veto power over a state’s decisions regarding the management of its schools. The IDEA did not intend to strip administrative powers away from local school boards and give them to parents of individual children.”). Relatedly, permitting an individual student to invoke the “stay put” provision to forestall system-wide actions necessitated by policy decisions, particularly budgetary concerns, “could undermine the statutory purpose of *223 providing an appropriate education to all handicapped children.” Tilton, 705 F.2d at 805 (emphasis in original). Allowing a student to use the “stay put” provision to block implementation of an action that applies to all students could obligate the state, “against its reasoned judgment, to finance a program for some handicapped children because of the bare allegations of a single interested party,” and such “forced spending might well deprive other handicapped children of needed resources.” Id[5]
Third, the power to approve programs and control fiscal matters is a power vested with the state. Dima v. Macchiarola, 513 F.Supp. 565, 570 (E.D.N.Y.1981) (“Congress never intended to expand these classification safeguards to obstruct a decision by the Board or the State to retain or discard the services of a private school.... [T]hey must be permitted to make an independent determination regarding the suitability of private institutions to fulfill the educational and fiscal needs of the system without first according the parents and guardians a due process forum,” and thus school board’s refusal to contract with school was a policy decision that did not trigger the notice and hearing requirements of § 1415); Corbett for Corbett v. Reg’l Ctr. of the East Bay, Inc., 699 F.Supp. 230, 232 (N.D.Cal.1988) (noting that an agency is “responsible for protecting the integrity of [its ljicensing system, and the health and safety of residents of licensed facilities” and holding that revocation of a service provider’s license did not trigger the “stay put” provision because the state agency “must be permitted to challenge, in good faith, [a service provider’s] license to operate a community care facility based on legitimate health and safety concerns”); see also White, 343 F.3d at 380 (noting that where a school district had “elected to provide services at a centralized location” rather than in a particular neighborhood, “[t]his [was] a permissible policy choice under the IDEA”); Flour Bluff, 91 F.3d at 694 (recognizing that states may choose to employ regional day schools to better “allocate] the[ir] limited resources” so as to “better ... provide for its disabled students”). The IDEA recognizes that states “shall determine whether [private] schools and facilities meet the standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies.” 20 U.S.C. § 1412(a)(10)(B)(ii). The IDEA, in effect, “expressly incorporates State educational standards.” Schimmel by Schimmel v. Spillane, 819 F.2d 477, 484 (4th Cir.1987). “Because unapproved private schools do not meet the State educational standards,” the IDEA “does not require [a state’s] school systems to place and fund handicapped children in unapproved private schools.” Id.; see also Antkowiak by Antkowiak v. Ambach, 838 F.2d 635, 640 (2d Cir.1988) (holding district court lacked authority to order placement at a school not approved by the state). Thus, the statute’s goal of protecting individual students combined with the state’s obligation to approve schools for the benefit of all students demonstrate that a statutory provision geared to protect individual students was not meant to be a mechanism to challenge decisions that apply to all students, even if *224 an individual student is impacted by that decision in a unique way.[6]
Here, Plaintiffs seek to “[e]njoin[] the [Defendants] from enforcing N.J.A.C. 6A:14-4.7(a) in a manner that precludes LCEC from implementing the mainstreaming component of E.M.’s IEP.” App. 37. This claim in effect challenges the NJDOE’s licensing decision concerning LCEC. Although Plaintiffs have attempted to cast NJDOE’s decision as a violation of E.M.’s IEP because enforcement of the regulation will impact her, there is no allegation that NJDOE’s enforcement of the regulation targets E.M. or changes her IEP. In fact, NJDOE’s position equally applies to all LCEC students with an IEP that provides for mainstreaming. Thus, Plaintiffs challenge a policy decision that does not trigger the “stay put” provision. See Tilton, 705 F.2d at 805 (decision to close school “for purely budgetary reasons” did not trigger “stay put” provision); Corbett, 699 F.Supp. at 232 (revocation of a service provider’s license was policy decision that did not trigger the “stay put” provision).
E.M. is entitled -to every protection available to her, including a free and appropriate education in the least restrictive environment. Nonetheless, efforts to secure these protections must be brought against the proper parties in the proper forum.
For all of these reasons, I would vacate the order granting “stay put” relief under § 1415.

. Because the IDEA’S predecessor statutes contained a "stay put” provision similar to that of the IDEA, we may properly look to cases that predate the IDEA for guidance in interpreting its "stay put” provision. See Pardini v. Allegheny Intermediate Unit,.420 F.3d 181, 186 (3d Cir.2005); Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1206 (3d Cir.1993).

. As the Majority correctly notes, E.M.'s IEP is not part of the record and the only information about it comes from assertions in the pleadings.

. To the extent Plaintiffs argue that E.M.'s educational placement has changed because LCEC no longer provides mainstreaming, they have asserted the wrong claim. The proper vehicle to challenge a failure to provide mainstreaming consistent with the requirements of E.M.'s IEP is a claim against the Hoboken School District for "failure to implement” her IEP. See Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir.2000).

. See also Tilton, 705 F.2d at 804; S.Rep. No. 94-168, 94th Cong., 1st Sess. 26 (1975) (showing the Senate Committee was "deeply concerned about practices and procedures which result in classifying children as having handicapping conditions when, in fact, they do not have such conditions.”).

. Under the Majority's rule, if a system-wide decision or policy results in closing a school and if there are no viable alternative programs for a particular student, then that student would be permitted to stop the implementation of the decision or policy, even if the state had a reason for its actions. If a decision or policy resulted in a particular student having no alternatives, the answer is to create an alternative, not to require the state to allow a school to operate in contravention of the rule or policy.

. This is not to say that the IDEA could never be used as a vehicle to challenge a policy decision that violates the statute nor is it to say that other avenues for relief cannot be pursued to protect the interests of an individual child. Rather, challenges to universally applicable policy decisions do not trigger an individual student’s right to "stay put" under § 1415.